THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES MICHAEL COHEN, Defendant-Appellant.

First District (5th Division)   No. 83—2479

Opinion filed April 18, 1986.

Glenn Seiden and James A. Graham, both of Glenn Seiden & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Donna B. More, and Gustavo Munoz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant James Michael Cohen was convicted of home invasion and sentenced to a 15-year prison term, to be served consecutively to a previously-imposed three-year sentence. On appeal, defendant contends (1) the State's identification testimony was insufficient to establish his guilt beyond a reasonable doubt; (2) the State failed to prove that defendant knew or had reason to know someone was present in the apartment he allegedly entered; (3) the trial court's conduct of the proceedings denied defendant a fair trial; (4) defendant's sentence was excessive and was improperly made consecutive without the requisite finding of the need to protect the public.

We affirm.

At trial the following pertinent evidence was adduced. George Brdlik, an art dealer, testified that he lived at 2823 North Troy with Sharon Ruta and sold art from that residence. At 9 a.m. on October 11, 1981, a man identifying himself on the telephone as Michael Ross arranged to come to Brdlik's home at about 11 a.m. to view some art pieces Brdlik had advertised for sale. At 9:45 a.m. that day two men came to the door. One of the men, identified at trial by Brdlik as the defendant, introduced himself as Michael Ross. Brdlik took the men upstairs to a furnished apartment used by him as an art gallery.

After viewing the art for about an hour defendant stated he wished to confer with his wife before making a purchase. As the men were leaving, defendant asked Brdlik if anyone lived on the first floor. Brdlik said he did. Brdlik had also told defendant he should not call till after 6 because Brdlik had to take "Sharon" to work.

According to Brdlik, Sharon Ruta remained on the first floor all this time. When the men left, Brdlik told Ruta he thought he was going to make a sale. Brdlik then drove to his parents' home in West-

mont. At about 4:30 p.m. Ruta called, crying and hysterical, telling Brdlik "They came back and took everything." Brdlik immediately drove home where he found that a screen from an upstairs kitchen window had been removed and a number of art pieces were missing.

On July 6, 1982, Brdlik was informed by Detective Robert Collins that some of his art pieces had been recovered. Later that day Brdlik identified the defendant from an array of five or six photographs. He was unable to identify anyone in a lineup which included defendant's brother, but not defendant. On July 21 Brdlik viewed a second lineup and identified the defendant.

Sharon Ruta testified that on October 11, 1981, she lived with George Brdlik at 2823 North Troy. She was in the downstairs apartment when people came over that morning to look at the art, and she did not see them. At about 2:30 p.m. a man telephoned her and said "Sharon, I thought George was taking you to work." When Ruta did not respond the man asked if George was home. She told him she did not expect him back till 6 p.m. Shortly thereafter Ruta responded to a knock on the door. A young man at the door said that his brother had been there earlier and he (the young man) now wanted to see the art. When Ruta heard a noise coming from upstairs she slammed the door and went upstairs. There she confronted a man, identified by her in court as the defendant, standing in the kitchen area.

The defendant grabbed Ruta's hand and told her she would not be hurt if she did what she was told. Ruta testified she recognized defendant's voice as that of the man who had telephoned her. The defendant placed a sack over Ruta's head and walked her down to the first floor. She heard the front door being opened and was then taken upstairs, this time hearing a third person accompanying them. Defendant told her to lie down on the floor, from where she could hear the sounds of artwork being taken off the wall and stacked on the floor.

When defendant attempted to take Ruta down the stairs she refused, sitting on the first stair and refusing to move despite his threats. Ruta then heard defendant run out. She removed the sack and ran to the door where she could see defendant running to a car down the street. She telephoned Brdlik immediately after ascertaining that the intruders were gone.

Ruta testified that on July 6, 1982, she identified defendant from a photographic array. On July 7 she viewed a lineup without identifying anybody, and on July 14 she identified the defendant in another lineup.

The State also presented uncontradicted testimony by a number

of witnesses establishing that in June 1982 defendant had attempted to sell six of the stolen pieces to an acquaintance, Martin Suppo. These pieces were recovered when an art gallery examining them for Suppo notified the police. A subsequent police search of defendant's home resulted in the recovery of other pieces stolen from Brdlik.

Defense witness Charles Chrisos testified that defendant worked for him at a Des Plaines hair salon in October 1981. On October 11 Chrisos conducted a training seminar attended by defendant. Chrisos recalled that defendant arrived at 10 a.m. or 10:30 a.m. and left at 4:15 or 4:30 p.m. He had referred to client cards in recalling the events of that day. A card for Evelyn Lydon indicated that defendant worked on her that day (for two hours beginning at 10:45 or 11 a.m.) and because the treatment was deficient she had to return the next day. Chrisos conceded that although all other notations were ink, those pertaining to defendant's treatment of Lydon were in pencil. He also stated that any of five or six employees, including the defendant, could have made those entries. Two of Chrisos' employees, Ellen O'Toole and Stephanie Limperis, testified that they saw defendant working on Lydon that day. O'Toole first saw defendant at "10, after 10" and last saw him there "after 4." Limperis testified she left at 4:30 and she thought defendant left "a little before." Evelyn Lydon also testified that defendant treated her hair that day.

■ We find no merit to defendant's contention concerning the insufficient of the State's identification evidence. Thus although defendant contends that Sharon Ruta failed to tell the police of unsightly hair-transplant sores on the defendant's head, the record establishes that she testified during the incident that defendant wore a painter's cap with a brim. Defendant also contends that Ruta's identification was tainted because prior to her initial identification of defendant from a photographic array, George Brdlik informed her he had identified a photograph of a man with light hair. However, Ruta testified that there were several men with light hair in the photographs and her identification was uninfluenced by Brdlik's information. Defendant has failed to include those particular photographs in the record on appeal, but in any event this was merely a factor to be considered by the jury as the finder of fact. We will not disturb the jury's determination absent a showing that it was so contrary to the evidence as to raise a reasonable doubt of defendant's guilt. (*People v. Banks* (1984), 121 Ill. App. 3d 279, 459 N.E.2d 992.) None of the factors cited by defendant support such a finding. Although defendant contends the identifications were tainted by the fact Ruta and Brdlik were first informed the artwork had been found, thus suggesting that the suspects

were in custody, such suggestiveness is inherent in any request to view a lineup or photographic array. We have reviewed all of defendant's contentions concerning the identification procedures used in this cause and find no basis in them for overturning the jury's verdict.

We also find no merit to defendant's contention that the State failed to establish that he knew or had reason to know that the premises he entered were occupied. Conviction for home invasion requires, *inter alia*, that an unauthorized entry be made into the dwelling place of another by a person who "knows or has reason to know that one or more persons is present ***." (Ill. Rev. Stat. 1983, ch. 38, par. 12— 11.) Citing *People v. Pettit* (1984), 101 Ill. 2d 309, 461 N.E.2d 991, defendant contends that the State did not establish this element of the offense. In *Pettit*, the defendants were charged with home invasion of a second-floor apartment. But the facts at trial established that the defendants entered a first-floor apartment and later took the first-floor occupants up to the second-floor apartment. The court held that the defendant's convictions for home invasion could not stand because the statute required the presence of one or more persons within the invaded dwelling at the time of the invasion.

In this cause, George Brdlik and Sharon Ruta occupied the entire house, described by Ruta as a brick bungalow with five to six rooms downstairs and a three- to four-room furnished attic apartment upstairs. One outside door led to a foyer with separate doors to the two apartments. The door to the upstairs apartment, where Brdlik kept his art, was kept locked. When defendant was shown the art, Brdlik unlocked the inner door and led him upstairs. According to Brdlik, defendant asked him on the way out who lived downstairs, and Brdlik told him he did. Defendant contends that based on this evidence it was not established that he knew or should have known that the upstairs apartment was also occupied by Brdlik and Ruta. But defendant clearly knew that Brdlik was also utilizing the upstairs apartment to show his art. Furthermore, Sharon Ruta's testimony established that it was defendant who telephoned the residence and learned of her presence. The evidence also supported the inference that defendant then used an accomplice to lure Ruta to the front door of the residence while he broke in upstairs. All these factors manifestly supported a finding that defendant knew the residence was occupied when he entered it. Thus, we find that the State did prove this element of the offense.

Defendant also contends that the trial court exhibited favoritism to the State in the manner in which it conducted the trial. Defendant first notes a number of instances in which the court asked

clarifying questions of State witnesses. In the only instance in which defense counsel objected to this procedure, the court noted that it was merely attempting to avoid confusion by the jury. A trial court may properly exercise its discretion by asking questions of a witness to eliminate confusion. (*People v. Wells* (1982), 106 Ill. App. 3d 1077, 436 N.E.2d 688.) We find no abuse of that discretion in this cause.

Defendant asserts that in another display of favoritism the court precluded defense counsel from cross-examining George Brdlik concerning whether he had discussed with a detective conducting the first lineup the presence of defendant's brother in the lineup. Defendant further asserts that the court restricted cross-examination of Brdlik concerning his telephone call to Ruta, telling Ruta he had identified a man with light hair from a photographic array. In fact, a review of the record establishes that defense counsel did cross-examine the witness on both of these subjects.

The last instance of alleged favoritism cited by defendant is a reprimand of a defense witness. The record establishes that while an objection was pending to a State cross-examination question of this defense witness, the witness told the court to let the State go on with its questioning. We find no abuse of discretion in the court's ensuing admonishment of the witness not to give instructions in the courtroom, given the contumacious attitude of the witness. *Sokol v. Mortimer* (1967), 81 Ill. App. 2d 55, 225 N.E.2d 496.

Finally, defendant contends that his sentence was excessive and was improperly made consecutive without the requisite finding of the need to protect the public. The 15-year sentence defendant received from this Class X offense was well within the permissible statutory range of six to 30 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(3).) The record establishes that within a 10-year period prior to this trial defendant had prior convictions for numerous offenses including delivery of a controlled substance, aggravated battery, felony theft, and burglary. Defendant cites as a mitigating factor emotional problems he allegedly suffered after the violent death of his mother. This event, which occurred 20 years prior to sentencing, was cited to the sentencing judge, who stated to defendant in sentencing him:

> "The Court finds from all that has been considered that you are a criminal schemer and a person dedicated to a life of crime, to a life of deviousness, a life of stealing, and that you have advanced in your criminal activities."

We find no abuse of discretion in the court's determination that a 15-year sentence was appropriate, and consequently we may not alter

that sentence. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

Defendant contends that in any event it was error for the trial court to make his sentence consecutive without expressly finding that such a term was required to protect the public. By failing to request a statement of reasons for the sentence, defendant has waived the issue. (*People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855.) Furthermore, the trial court's remarks quoted above establish that the court believed a consecutive sentence was necessary to protect the public. (*People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836.) Accordingly we find no basis for disturbing the sentence imposed.

The judgment of the trial court is affirmed.

Affirmed.

*MEJDA, P.J., and SULLIVAN, J., concur.

---

*This opinion was concurred in prior to the retirement of Presiding Justice James J. Mejda from the court.